ACCEPTED
01-15-00621-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
11/25/2015 5:39:46 PM
CHRISTOPHER PRINE
CLERK

**NO. 01-15-00621-CV**

In the
FIRST COURT OF APPEALS
at Houston

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

11/25/2015 5:39:46 PM

CHRISTOPHER A. PRINE
Clerk

_____

SUPPLY PRO, INC. and
HARMON K FINE,
Appellants,


v.


ECOSORB INTERNATIONAL, INC.,
d/b/a BIOCEL TECHNOLOGIES,
Appellee

_____


Appealed from the 11th District Court
of Harris County, Texas

_____


**BRIEF OF APPELLANTS**

_____

Richard H. Edelman
Texas Bar. No. 06413200
rhe@edelmanoffice.com
BARLOW JONES L.L.P.
17225 El Camino Real, Suite 400
Houston, Texas 77058
Telephone: (281) 488-8440
Facsimile: (281) 488-6832

William F. Harmeyer
Texas Bar No. 09019000
wharmeyer@harmeyerlaw.com
WILLIAM F. HARMEYER &
ASSOCIATES, P.C.
7322 Southwest Freeway, Suite 475
Houston, Texas 77074
Telephone: (713) 270-5552
Facsimile: (713) 270-7128

ATTORNEYS FOR APPELLANTS

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

APPELLANTS:     **Supply Pro, Inc.** and **Harmon K. Fine**

**Richard H. Edelman**
Texas Bar. No. 06413200
rhe@edelmanoffice.com
**BARLOW JONES L.L.P.**
17225 El Camino Real, Suite 400
Houston, Texas 77058
Telephone: (281) 488-8440
Facsimile:  (281) 488-6832

**William F. Harmeyer**
Texas Bar No. 09019000
wharmeyer@harmeyerlaw.com
**WILLIAM F. HARMEYER &**
**ASSOCIATES, P.C.**
7322 Southwest Freeway, Suite 475
Houston, Texas 77074
Telephone: (713) 270-5552
Facsimile: (713) 270-7128

APPELLEE:     **Ecosorb International, Inc.** d/b/a **Biocel Technologies**

**T. Earnest Freeman**
Texas Bar No. 07431600
ernest@thefreemanlawfirm.com
**Stephen G. Scholl**
Texas Bar No. 17801350
steve@thefreemanlawfirm.com
**THE FREEMAN LAW FIRM, P.C.**
1770 St. James Place, Suite 120
Houston, Texas 77056
Telephone: (713) 973-1000
Facsimile:  (713) 973-1004

**Jonathan S. Stoger**
Texas Bar No. 00797504
jstoger@stogerlaw.com
**JONATHAN STOGER LAW**
2301 Morse Street
Houston, Texas 77019
Telephone: (713) 522-2848
Facsimile:   (713) 522-1120

**TABLE OF CONTENTS**

IDENTITY OF PARTIES AND COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.      Standards of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        A.    Denial of motion for JNOV or to disregard jury findings. . . . . . . . . 13
        B.    Legal Sufficiency. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        C.    Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        D.    Contract Construction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.     The evidence is legally insufficient to support the jury's liability
        findings on the clawback provision. . . . . . . . . . . . . . . . . . . . . . . . . 17
        A.    The proposed take or pay term was not part of the parties' original
              agreements on the July purchase orders. . . . . . . . . . . . . . . . . . . 17
        B.    Because the proposed take or pay term was not part of the original
              agreements on the July purchase orders, and Fine did not agree to
              it in the August 16 email, the clawback provision was not
              impliedly part of the parties' workout agreement. . . . . . . . . . . . . . 19

III.    In the alternative, if the proposed take or pay term was part of the
        parties' original agreements on the July purchase orders, then the
        evidence raised a material fact question on whether the take or pay term
        was induced by fraud; and the trial court reversibly erred by refusing to
        submit appellants' requested charge questions on fraudulent inducement
        or equitable estoppel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

iii

A. The take or pay term was fraudulently induced. . . . . . . . . . . . . . . . . 23

B. The fraudulent inducement was not absolved or mooted by the workout agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

C. Error and harm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

IV. The evidence is legally insufficient to prove the damages found in charge question 7(b-d) (as well as questions 6(b-c), 10, and 11). . . . . . . . . 34

A. Storage charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

B. Clawback provision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

C. Take or pay damages on the purchase orders. . . . . . . . . . . . . . . . . . 38

V. The evidence is legally and factually insufficient to support the awards of punitive damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A. Punitive damage limits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

B. The evidence is legally insufficient to prove that Supply Pro committed fraud independently from Fine. . . . . . . . . . . . . . . . . . . . . 41

C. The evidence is legally insufficient to support separate awards of punitive damages against Fine and Supply Pro because there is no evidence of independent fraud by Supply Pro. . . . . . . . . . . . . . . . . . 42

D. The combined $1.8 million punitive damage award is excessive under the Texas and Federal Standards. . . . . . . . . . . . . . . . . . . . . . . 43

VI. The trial court erred by not incorporating Biocel's remittitur on prejudgment interest into the Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . 44

PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

WORD COUNT CERTIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

# INDEX OF AUTHORITIES

## Cases

*Am. Mfrs. Mut. Ins. Co. v. Schaefer*,
 124 S.W.3d 154 (Tex. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 23

*Bunton v. Bentley*, 153 S.W.3d 50 (Tex. 2004).. . . . . . . . . . . . . . . . . . . . . . . 40, 41

*Burbage v. Burbage*, 447 S.W.3d 249 (Tex. 2014). . . . . . . . . . . . . . . . . . 15

*Chambers v. Equity Bank*, SSB, 319 S.W.3d 892
 (Tex. App.–Texarkana 2010, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005). . . . . . . . . . . . . 15, 16, 21, 23

*Columbia Rio Grande Healthcare, L.P. v. Hawley*,
 284 S.W.3d 851 (Tex. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 33, 34

*Dallas Ry. & Terminal Co. v. Gossett*,
 156 Tex. 252, 294 S.W.2d 377 (1956). . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*ERI Consulting Eng'rs, Inc. v. Swinnea*,
 318 S.W.3d 867 (Tex. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ford Motor Co. v. Castillo*, 444 S.W.3d 616 (Tex. 2014). . . . . . . . . . . . . 15, 29, 30

*Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex. 2000). . . . . . . . . . . 31, 32

*Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261 (Tex. 2014). . . . . . . . . . 14

*Guevara v. Ferrer*, 247 S.W.3d 662 (Tex. 2007). . . . . . . . . . . . . . . . . . . . . . . 15

*Hoss v. Alardin*, 338 S.W.3d 635 (Tex. App.–Dallas 2011, no pet.). . . . . . . . . . 20

*Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*,
 352 S.W.3d 462 (Tex. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 22

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
 341 S.W.3d 323 (Tex. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Kachina Pipeline Co., Inc. v. Lillis*, No. 13-05956,
 2015 WL 5889109 (Tex. Oct. 9, 2015). . . . . . . . . . . . . . . . . . . . 16, 17, 22, 23

*LHC Nashua Partnership, L.L.C. v. PDNED Sagamore Nashua, L.L.C.*,
 659 F3d 450 (5th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Lindley v. McKnight*, 349 S.W.3d 113
 (Tex. App.–Fort Worth 2011, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Malone v. Kisabeth Co., Inc.* 726 S.W.2d 188
 (Tex. App.–Fort Worth 1987, writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . 35

*Manon v. Solis*, 142 S.W.3d 380
 (Tex. App.–Houston [14th Dist.] 2004, pet. denied).. . . . . . . . . . . . . . . . . . . 14

*Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419 (Tex. 2015).. . . . . . . . 24

*Owens-Corning Fiberglas Corp. v. Malone*,
 972 S.W.2d 35 (Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41, 43

*Plains Exploration & Prod. Co. v. Torch Energy Advisors Inc.*,
 No. 13-0597, 2015 WL 3653330 (Tex. June 12, 2015).. . . . . . . . . . . . . . . . . . . 16

*Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014).. . . . . . . . . . . . . . . . . . . . . 16, 23

*Se. Pipe Line Co., Inc. v. Tichacek*, 997 S.W.2d 166 (Tex. 1999). . . . . . . . . . . . 14

*Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640 (Tex. 1996).. . . . . . . . . . . 16, 23

*Tiller v. McLure*, 121 S.W.3d 709 (Tex. 2003).. . . . . . . . . . . . . . . . . . . . . . 14

*Tony Gullo Motors I, L.P. v. Chapa*,
 212 S.W.3d 299 (Tex. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41, 44

*Travelers Ins. Co. v. Wilson*, 28 S.W.3d 42
 (Tex. App.—Texarkana 2000, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Statutes**

Tex. Bus. & Com. Code Ann. § 2.201 (West 2009). . . . . . . . . . . . . . . . . . . . . . . 18

Tex. Bus. & Com. Code Ann. § 2.207 (West 2009). . . . . . . . . . . . . . . . . . . . . 18, 19

Tex. Bus. & Com. Code Ann. § 2.710 (West 2009). . . . . . . . . . . . . . . . . . . . . . . 34

Tex. Civ. Prac. & Rem. Code Ann. § 41.006 (West 2014). . . . . . . . . . . . . . . . . . 39

Tex. Civ. Prac. & Rem. Code Ann. § 41.008 (West 2014). . . . . . . . . . . . . . . . . . 40

Tex. Civ. Prac. & Rem. Code Ann. § 41.011 (West 2014). . . . . . . . . . . . . . . . . . 40

**Rules**

Tex. R. App. P.  9.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Tex. R. App. P. 44.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Tex. R. Civ. P. 278. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Tex. R. Civ. P. 301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## STATEMENT OF THE CASE

This dispute arose from sales of K-Sorb, a treated cellulose fiber product, by Ecosorb International, Inc., d/b/a Biocel Technologies ("Biocel") to Supply Pro, Inc. ("Supply Pro"). The trial court entered judgment (the "Judgment," 4 C 2454-56) on a jury verdict (4 C 1931-56), awarding Biocel actual damages for fraud, punitive damages, and prejudgment interest totaling over $2.7 million against Supply Pro and its owner and President, Harmon Fine.[1]

## ISSUES PRESENTED

1. Because the proposed take or pay term was not part of the parties' original agreements under the July 13 and 29 purchase orders as a matter of law, the proposed "clawback provision" for the take or pay term was not impliedly part of the parties' workout agreement, and the evidence is legally insufficient to support the jury's liability findings relating to the clawback provision.

2. In the alternative, if the proposed take or pay term was part of the parties' original agreements on the July 13 and 29 purchase orders, then the evidence raised a material fact question whether the take or pay term was induced by fraud, and the trial court erred by refusing to submit appellants' requested charge questions on fraudulent inducement or equitable estoppel.

---

[1] The following record abbreviations will be used: Clerk's Record, "__ C __"; Supplemental Clerk's Record, "__ SC __"; Reporter's Record, "__ R __"; Plaintiff's Exhibits, "P __"; Defendant's Exhibits, "D __." It appears that the portion of the reporter's record from 5 R 86, line 13, to 5 R 152, line 22, is the same as 5 R 152, line 23, to 5 R 218, line 18. Therefore, no citations have been made to the latter portion of the reporter's record.

1

3.      The evidence is legally insufficient to support the damage awards for storage charges, the clawback provision, and the take or pay term.

4.      The evidence is legally and factually insufficient to support the awards of punitive damages.

5.      The trial court erred by not incorporating Biocel's remitittur on prejudgment interest into the Judgment.

## STATEMENT OF FACTS

As relevant to the issues presented in this appeal, Supply Pro manufactured and sold forty percent of the absorbent floating boom that was used to contain and clean-up the oil spill (the "spill") that resulted from the British Petroleum ("BP") Deepwater Horizon rig explosion, which occurred in April of 2010.  2 C 1280(¶9); P 79(0050 ¶1);[2] 4 R 103-104.  Fine is the President and owner of Supply Pro.  2 C 1280; 4 R 14; 8 R 39.  Supply Pro sells its boom through distributors rather than end users.  4 R 205-06.  Supply Pro's distributor for selling boom to BP was Pacific Environmental ("PE").  2 C 1280(¶9).  John Summers was the consultant at PE who introduced BP to Supply Pro and served as the intermediary between them.  4 R 130-31, 145; 5 R 239.  In order for boom to perform its function, the material inside the boom must float, absorb oil, and not absorb water.  5 R 231.  Historically, the filler material

---

[2]      Parenthetical references following exhibit numbers are to the last 4 digits of the bates-stamp number of the page within the exhibit.  The pages of some exhibits are not in bates-number order.

inside the boom that performs this function has been scrap polypropylene ("polyscrap"). 4 R 221-22. However, following the spill, there was not enough polyscrap to produce the amount of boom needed for the spill, and non-scrap polypropylene was too expensive to use in boom. 4 R 106-07, 143; 5 R 231-32; 7 R 10.

Biocel, and its parent company, International Cellulose Corporation ("ICC"), manufacture and sell cellulose fiber products made from recycled paper and cardboard. 3 R 50, 88-89. Steve Kempe is the owner of ICC, which manufactures the goods that Biocel sells. 5 R 9, 12-13. One of Biocel's products is K-Sorb, a cellulose fiber product that has been chemically treated to make it hydrophobic (water repellent). 2 C 1279-80; 5 R 13-14; 7 R 25. Before the spill, Biocel had not sold much K-Sorb. 3 R 90-92; P 125. During the spill, Biocel was being contacted by a lot of people about using its products to make boom. 3 R 69-70; 5 R57.

On May 13, 2010, Larry Svoboda, Biocel's Vice President for sales and marketing and its only salesperson (3 R 50, 88-89), emailed Scott Mitchell, the sales manager for Supply Pro (4 R 204), that K-Sorb had the attributes needed for use in boom and that the finest boom manufacturers were using Biocel's hydrophobic fiber as a filler in boom. P 3; 7 R 10. Svoboda also let Mitchell know that the supply chain was finite and Supply Pro better get in now if they wanted it. 7 R 10.

3

Supply Pro had previously bought Biocel products for resale (3 R 51-53; 7 R 8) and began buying K-Sorb for use in making its boom. 3 R 51-56; 4 R 14-15, 17; 7 R 8. On June 29, Mitchell emailed Svoboda that Supply Pro was expecting to ship ten truckloads of boom per day by mid-July and would thus need to buy 168,480 pounds of K-Sorb per day by then. P 18. A truckload of K-Sorb is 1,056 bags, each weighing 30 pounds, and thus 31,680 pounds. P 13; 3 R 74. At $13.80 per bag, a truckload costs $14,572.80. P 131(1185).

On July 11, Svoboda emailed Fine and Mitchell (the "July 11 email") that Biocel had "many new customers that are booking more than their needs," and that "due to the extreme production demands created by the oil containment crisis in the Gulf of Mexico, all orders for our hydrophobic materials" would be subject to the following "special terms": (1) orders would be "non-cancellable, 'take or pay;'"[3] (2) orders would require a minimum 14 day lead time; and (3) orders would be for full truck loads. P 23-24. Because purchase orders ("POs") could generally be cancelled unless there were terms prohibiting it (5 R 51, 63), the proposed take or pay term was a material change in Biocel's terms. 6 R 45.

---

[3]     Because "take or pay" is another way of saying non-cancellable (5 R 59), this term will simply be referred to as the proposed "take or pay term."

On July 13, Supply Pro submitted blanket PO[4] no. 41724 (the "July 13 PO") to Biocel for 31,680 bags (30 truckloads) of K-Sorb. P 26.[5] On July 16, Biocel issued its order acknowledgment (the "July 16 OA") for the July 13 PO. P 30; 5 R 62. This OA contained the special terms set forth in the July 11 email, including the proposed take or pay term. P 30. The first 25 truckloads ordered in the July 13 PO were shipped and invoiced from July 19 to 30. P 31.

On July 15, the BP well leak was capped (4 R 152, 190; 5 R 239), but the massive spill clean-up was expected to continue and require boom until November. 4 R 29-31, 35, 155; 5 R 237, 244-45, 284. However, on July 23-25, Tropical Storm Bonnie unexpectedly dispersed the remaining oil, although this would not be determined for several days. 4 R 157-58, 190; 5 R 43-44.

On July 27, BP instructed Supply Pro to reduce its production from ten truckloads of boom per day to three until August 17, but cautioned that circumstances could change quickly as the oil moved or reached land areas. P 34(0006); 5 R 284, 340-41. On July 29, Supply Pro submitted PO no. 41778 (the "July 29 PO") to Biocel for 29,568 bags (28 truckloads) of K-Sorb. P 37; 5 R 68-69. This would be needed

---

[4] A blanket purchase order is a purchase order for multiple shipments of material in which the seller invoices for each shipment as it is released. 3 R 157.

[5] This PO reflects a unit cost of $14,572.80, which applies to a truckload, rather than a bag. Thus, the total price on the PO, $461,666,304.00 is thus the incorrect product of multiplying the cost for a truckload by the number of bags ordered.

to supply the three truckload per day shipping schedule until August 17.[6]  5 R 296; 7 R 36.

On July 29, Biocel issued its OA (the "July 29 OA") for Supply Pro's July 29 PO.  P 38; 5 R 71-72.  This OA again reflected the special terms, including the proposed take or pay term.  P 38; 5 R 72.  Supply Pro did not reply to the July 16 or 29 OAs or otherwise respond concerning any of Biocel's proposed special terms.

On Friday, July 30, BP advised Supply Pro that conditions had changed drastically and instructed Supply Pro to stop all boom production until further notice because BP lacked space to store more material, but acknowledged that production could resume at a later time.  P 34(0016); 5 R 242-43, 246.  BP also said it might take several weeks to evaluate their long term plan.  P 34(0016).  Summers took this to mean that BP was overstocked with boom, and that this was an interruption, after which production would resume, rather than a cancellation.  5 R 244-45, 247.  However, by the following Wednesday, August 4, 2010, Summers and Supply Pro had concluded that this was not merely an interruption and sent Biocel notices that it was cancelling the remainder of its July 13 PO and all of its July 29 PO.  P 25, 36.

On Wednesday, August 11, Kempe and Fine met for lunch to discuss a possible

---

[6]  A truckload of fiber makes about 1.5 truckloads of boom.  7 R 43.  Therefore, 28 truckloads of fiber would make about 42 truckloads of boom.  At three truckloads of boom being shipped per day, this PO would supply boom shipments for about 14 days.

workout of the cancelled orders. 5 R 76; 6 R 30. By then, Supply Pro had paid for the 25 truckloads that had been delivered on the July 13 PO (roughly $364,320), as well as for all of the K-Sorb that had been delivered and invoiced under its previous purchase orders. P 127(0967-68) (reflecting payments for 41724 REL. 1-25 and a zero unpaid balance on issued invoices as of August 11).[7]

On Friday, August 13, Kempe sent Fine an email (the "August 13 email"), proposing written terms for what they had discussed on August 11. P 46(1387-88); 5 R 81-82, 87, 94. This email reflected that, of the 34,868 remaining undelivered bags of K-Sorb that Supply Pro had ordered in the July POs, Biocel then had in stock 6912 bags of finished K-Sorb plus raw materials to produce an additional 11,616 bags. P 46(1387); 5 R 84, 87, 91. As relevant to the relief awarded in the Judgment, the August 13 email proposed that:

    A.    If Supply Pro **was not** compensated by PE for terminating its boom deliveries, then:

        1.    Supply Pro and Biocel would continue trying to sell the remaining 6912 bags of K-Sorb until February 1, 2011, after which Supply Pro would be invoiced for any remaining inventory.

        2.    Subject to its vendor's approval, Biocel would return the unused

---

[7]    According to Biocel's records, Supply Pro paid Biocel nearly $900,000 from January of 2010 to March of 2011. P 127.

7

raw material[8] it had in stock for 11,616 bags if Supply Pro would pay a $12,750 restocking fee (otherwise, those bags would be produced and invoiced to Supply Pro). 5 R 96.

3. Biocel would waive the purchase requirement for the remaining 16,320 bags (for which Biocel did not yet have raw materials in inventory (5 R 88)).

B. Alternatively, if Supply Pro **was** later compensated by PE for terminating its boom deliveries, Supply Pro would so notify Biocel and compensate Biocel in the same proportion as Supply Pro was compensated less the restocking fee (in item A2 above), if paid by Supply Pro (this provision was referred to by Kempe as the "clawback provision" (5 R 101)).

P 46 (1387-88).

On Monday, August 16, Fine replied by email (the "August 16 email") to Kempe's August 13 email:

I authorize you to return the chemical to your manufacturer and charge me the $12,750 for return. . . .

Supply Pro accepts the offer of your assistance in selling the remaining 6912 bags within a 6 month period. Supply Pro will purchase the balance unsold at that time. . . .

P 46(0946). Although the August 16 email said nothing about any of the other provisions of the August 13 email (P 46(0946); 6 R 34), Kempe emailed back within ten minutes that the return process was underway. P 46(0946). On August 27,

---

[8] The raw materials to be returned for the restocking fee were the chemicals used to make the fiber in K-Sorb hydrophobic. P 46(0946); 4 R 78-79. Biocel's remaining inventory of fiber for those bags may have been used in ICC's other operations over time. 6 R 42.

Kempe emailed Fine that the raw material return had been completed. P 51; 5 R 104. Supply Pro paid Biocel the restocking fee (5 R 105), but the parties never communicated about the portions of the August 13 email to which the August 16 email had not responded.

On September 3, following negotiations between BP and PE, and then between the owners of PE (5 R 247-52), PE sent Supply Pro a wire transfer for $1,592,448.00. P 55, 128; 4 R 185-86. This represented full payment for PE's cancelled orders for 58 truckloads of boom from Supply Pro (the "cancellation fee"). P 50; 4 R 215; 5 R 268.

On December 1, Fine advised Kempe that Supply Pro still had 21 truckloads of boom in its warehouse[9] and $1.7 million of feedstock that would probably never be used. P 58; 4 R 226-27. Supply Pro was never able to sell much of this remaining fiber boom (7 R 20); none of the remaining 6912 bags of K-Sorb held by Biocel were ever sold; and Supply Pro did not pay for them. 2 C 1282(¶15-16). Nor did Supply Pro disclose to Biocel that it had been paid for its terminated boom deliveries or pay Biocel any portion of its cancellation fee.

Biocel filed suit against Supply Pro in 2012, and the case was tried to a jury. In response to the thirteen charge questions, the jury found that:

---

[9] BP had returned 13 truckloads of unused boom to Supply Pro. 5 R 275-76.

9

1. The parties agreed that the clawback provision proposed in the August 13 email would be part of the "workout agreement."[10]

2. Supply Pro failed to comply with the workout agreement.

3. Biocel and Fine agreed that Fine would personally guaranty the workout agreement.

4. Fine failed to comply with the personal guaranty.

5. Supply Pro and Fine each committed fraud against Biocel.[11]

6. The damages resulting from the failure to comply were:

    a. The price of the 6912 bales on February 1, 2011 that Biocel was unable to resell at a reasonable price: $95,385.60.

    b. Commercially reasonable and necessary charges for the custody and care of the goods stored by Biocel: $303,815.65.

    c. Biocel's proportionate share of compensation received by Supply Pro from its distributor for the termination of the boom deliveries: $385,517.00.

7. The damages from the fraud were:

    a. The price of the 6912 bales on February 1, 2011 that Biocel was unable to resell at a reasonable price: $95,385.60 [same as 6a.].

---

[10]  The trial court denied appellants' request to define the "workout agreement" as consisting of the August 13 and 16 emails.  8 R 7-8.

[11]  As it was submitted in the charge, Biocel's fraud claim was based on the allegations that Fine and Supply Pro had fraudulently induced the workout agreement by: (1) entering into it without intending to perform; and (2) misrepresenting that it was in a precarious financial position due to the sudden evaporation of its market for boom and that it had no expectation of receiving compensation for the cancellation of its boom sales.  2 C 1283-84.

10

b. Commercially reasonable and necessary charges for the custody and care of the goods stored by Biocel: $303,815.65 [same as 6b].

c. Biocel's proportionate share of compensation received by Supply Pro from its distributor for the termination of the boom deliveries: $385,517.00 [same as 6c].

d. The unpaid amounts due under the July POs: $480,902.60 [the sum of the amounts awarded in 7a and 7b].

8. By clear and convincing evidence, the harm to Biocel resulted from fraud of each, Supply Pro and Fine.

9. A reasonable fee for the necessary services of Biocel's attorney was:

a. For preparation and trial: $637,455.
b. For appeal to the Court of Appeals: $42,500.
c. For appeal to the Supreme Court of Texas: $32,500.

10. Biocel's proportionate share of compensation received by Supply Pro from Supply Pro's distributor for the termination of the boom deliveries: $385,517.00 [same as 6c and 7c].[12]

11. The unpaid amounts due under the July 13 and July 29 POs: $480,902.60. [same as 7d.]

12. The exemplary damages that should be assessed against Supply Pro for the conduct found in question 8a: $800,000.00.

13. The exemplary damages that should be assessed against Fine for the conduct found in question 8b: $1,000,000.00.

4 C 1931-56.

---

[12] This amount approximates the amount due for the 27,956 bags that were ordered but not produced, without reduction for the restocking fee.

On April, 21, 2015, pursuant to Biocel's election, the trial court entered Judgment on the fraud and exemplary damage findings (rather than the contract findings). 4 C 2454-56. Appellants filed timely post-judgment motions, asserting all of the sufficiency of the evidence challenges presented in this appeal. 4 C 2457-81. The trial court denied appellants' post-judgment motions on June 29, 2015 (4 C 2510); but did not rule on, or modify the Judgment to reflect, the remittitur that Biocel filed on June 29, 2105 to correct the award of prejudgment interest. 4 C 2511-12.

## SUMMARY OF THE ARGUMENT

In this appeal, Supply Pro does not challenge its liability to pay for the 6912 undelivered bags of K-Sorb that had been produced when it cancelled the POs. Supply Pro does, however, challenge its liability for the storage charges for those bags as well as the liability that was based on Biocel's proposed take or pay term and proposed clawback provision, relating to the remaining bags that had been ordered in the July POs but never produced.

As discussed in the following sections, the proposed take or pay term was not part of the parties' original agreements on the July POs; the proposed "clawback provision" pertaining to the proposed take or pay term was not expressly or impliedly part of the parties' workout agreement; and the evidence is therefore legally insufficient to support the jury's liability and damage findings relating to the

12

clawback provision. Alternatively, if the proposed take or pay term was part of the parties' original agreements on the July POs, then the evidence raised a fact issue whether that term was induced by fraud. The workout agreement was not a ratification of the original agreements that could absolve this fraud because Supply Pro did not know of the fraud when it entered into the workout agreement. Therefore, the trial court reversibly erred by refusing to submit appellants' proposed charge questions on fraudulent inducement or equitable estoppel.

The evidence is also legally insufficient to support the award of damages for storage charges because there is no evidence that the remaining 6912 bags of K-Sorb should have been stored at all; and there is no evidence of a commercially reasonable storage rate. The evidence is also legally insufficient to support the jury's independent finding of fraud against Supply Pro and, in turn, its separate award of punitive damages against Supply Pro because there was no allegation or evidence that the alleged fraudulent conduct was committed by anyone at Supply Pro besides Fine. The total $1.8 million punitive damage award was also excessive.

## ARGUMENT

### I.     Standards of Review

#### A.     Denial of motion for JNOV or to disregard jury findings.

A trial court may grant a judgment notwithstanding the verdict ("JNOV") if

13

there is no evidence to support one or more of the jury findings on issues necessary to liability. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *see* Tex. R. Civ. P. 301. The denial of a motion for JNOV is thus reviewed under a legal sufficiency standard. *Manon v. Solis*, 142 S.W.3d 380, 387 (Tex. App.–Houston [14th Dist.] 2004, pet. denied).

A jury's answer may be disregarded if it has no support in the evidence or is immaterial. Tex. R. Civ. P. 301; *Se. Pipe Line Co., Inc. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999). A question is immaterial when it should not have been submitted, calls for a finding beyond the province of the jury, such as a question of law, or has been rendered immaterial by other findings. *Se. Pipeline,* 997 S.W.2d at 172.

## B. Legal Sufficiency.

To challenge the legal sufficiency of evidence supporting an adverse finding on an issue for which the challenging party did not have the burden of proof, the party must show that no evidence supports the adverse finding. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). A no evidence (legal sufficiency) challenge will be sustained when the record confirms either: (1) a complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the

opposite of the vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014). More than a scintilla exists where the evidence would enable reasonable and fair-minded people to reach different conclusions. *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014).

In a legal sufficiency review, the evidence is viewed in the light most favorable to the judgment, crediting favorable evidence and inferences if reasonable jurors could, and disregarding contrary evidence and inferences unless reasonable jurors could not. *Id.*; *Ford Motor Co.*, 444 S.W.3d at 620. However, evidence cannot be taken out of context in a way that makes it seem to support a verdict when it does not. *City of Keller v. Wilson*, 168 S.W.3d 802, 812 (Tex. 2005). Where no objection has been made to the jury charge, the legal sufficiency of the evidence is measured by the charge submitted to the jury. *Burbage*, 447 S.W.3d at 260.

## C.  Damages.

Uncertainty as to the fact versus the amount of legal damages is fatal to recovery. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 877-78 (Tex. 2010). However, where evidence is legally insufficient to prove the amount of damage awarded, but legally sufficient to prove that some amount of damage was suffered, the case should be remanded for remittitur or retrial. *Id.*; *Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007).

15

**D.  Contract Construction.**

A written contract must be construed to give effect to the parties' intent expressed in the text, as understood in light of the facts and circumstances surrounding the contract's execution, but subject to the parol evidence rule. *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011).  The construction of an unambiguous contract is a question of law that is reviewed de novo. *Kachina Pipeline Co., Inc. v. Lillis*, No. 13-05956, 2015 WL 5889109, at *2 (Tex. Oct. 9, 2015).  In construing a contract, courts examine the entire contract and give effect to each provision so that none is rendered meaningless. *Id*. at *3.

In construing a contract, a court does not consider only the parts favoring one party and disregard the remainder as that would render the latter meaningless. *City of Keller v. Wilson*, 168 S.W.3d at 811.  Nor may courts rewrite contracts or insert terms that the parties could have bargained for but did not.[13]

If a contract can be given a definite legal meaning, then it is not ambiguous. *Kachina*, 2015 WL 5889109, at *3.  Conversely, a contract is ambiguous only if it is subject to two or more reasonable interpretations. *Plains Exploration & Prod. Co.*

---

[13] *Ritchie v. Rupe*, 443 S.W.3d 856, 891 (Tex. 2014); *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003); *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996).

*v. Torch Energy Advisors Inc.*, No. 13-0597, 2015 WL 3653330, at *7 (Tex. June 12, 2015). While evidence of circumstances can be used to inform the contract text and render it capable of one meaning, extrinsic evidence can only be considered to interpret an ambiguous writing, not to create an ambiguity. *Kachina,* 2015 WL 5889109, at *3.

Where an agreement is ambiguous, the parties' intent is a fact question. *Kachina*, 2015 WL 5889109, at *2. Whether a contract is ambiguous is a legal question for the court. *Id.*

## II.     The evidence is legally insufficient to support the jury's liability findings on the clawback provision.

### A.     The proposed take or pay term was not part of the parties' original agreements on the July purchase orders.[14]

It is undisputed in this case that Biocel and Supply Pro are "merchants" and that the original sales of K-Sorb were subject to Chapter 2 of the Texas Business and Commerce Code (the "TBCC"). Section 2.207(a) and (b) of the TBCC provide:

(a) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance *even though it states terms additional to or different from those offered* or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

---

[14]     No charge question was requested or submitted on this issue, and none was warranted because, as discussed in this section, this was an issue of contract construction and, thus, a question of law for the court. *See Kachina Pipeline Co., Inc.*, 2015 WL 5889109, at *2.

17

(b) *The additional terms are to be construed as proposals for addition to the contract.* Between merchants such terms become part of the contract unless:
>    (1) the offer expressly limits acceptance to the terms of the offer;
>    (2) *they materially alter it*; or
>    (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Tex. Bus. & Com. Code Ann. § 2.207(a), (b) (West 2009) (emphasis added); *see id.* cmt. 3 (stating that additional terms that materially alter a contract are not included unless expressly agreed to).[15]

In this case, the July 11 email (P 23), purporting to impose the proposed take or pay term, was not an offer or an acceptance of any offer, and there is no evidence that Supply Pro ever agreed (or even responded) to that email. Therefore, the July 11 email did not create a contract and was not otherwise binding on Supply Pro.

Supply Pro's July POs were offers to buy K-Sorb and did not include a take or pay term. P 26, 37. Under section 2.207(a), Biocel's July 16 and 29 OAs were expressions of acceptance of the POs even though they contained additional terms to

---

[15]   In contrast to the foregoing provisions of section 2.207, the TBCC Statute of Frauds is satisfied between merchants if, among other things, a sufficient written confirmation is received by a party unless written notice of objection to its contents is given within ten days after it is received. Tex. Bus. & Com. Code Ann. § 2.201(b) (West 2009). However, the only effect of such a confirmation "is to take away from the party who fails to answer the defense of the Statute of Frauds . . . ." *Id.* cmt 3. It thus does not establish terms of the contract or override the effect of section 2.207 in doing so. *See id.* Because Supply Pro does not contend in this appeal that the agreements under the POs (or the workout agreement) were unenforceable under the Statute of Frauds, TBCC section 2.201 does not apply.

those set forth in the POs, including the proposed take or pay term. P. 30, 38. Pursuant to section 2.207(b), this additional term was to be construed as a proposal for an addition to the contract. Because the proposed take or pay term was a material alteration to the POs (as well as to Biocel's own terms and conditions (6 R 45)), it did not become part of the agreements for the purchase of K-Sorb under the POs as a matter of law. *See* TBCC § 2.207(b)(2).

B. **Because the proposed take or pay term was not part of the original agreements on the July purchase orders, and Fine did not agree to it in the August 16 email, the clawback provision was not impliedly part of the parties' workout agreement.**

The sole purpose of the clawback provision in the August 13 email was to compensate Biocel for what Kempe considered to be Supply Pro's take or pay obligation for the bags of K-Sorb that were ordered but not produced. 5 R 101. However, because the proposed take or pay term was not part of the parties' agreements on the July POs, as discussed in the preceding section, Supply Pro had no take or pay obligation for which to compensate Biocel in the workout agreement. In that Supply Pro had no take or pay obligation, and Fine's August 16 email did not agree to the clawback provision (P46(0946); 6 R 34), there is no reasonable interpretation of the August 16 email by which it could either be construed as ambiguous with regard to the clawback provision, or as somehow having impliedly

19

agreed to it.

Although Kempe testified that Fine had orally agreed during the August 11 lunch to the terms that would later be proposed in the August 13 email (6 R 48-49, 94), he did not say what statements Fine had made that Kempe interpreted as signifying such agreement. Because Kempe was not competent to testify about Fine's subjective intent, his testimony that Fine had orally agreed to the matters that would be proposed in the August 13 email was speculative, conclusory, and therefore no evidence.[16]

In addition, the fact that Kempe sent the August 13 email shows that, despite whatever had been discussed on August 11, Kempe still felt a need to reduce his understanding of the agreement to writing and to secure Fine's assent to that understanding. He thus stated in the August 13 email, "Kindly confirm your acceptance of the above. I also need to hear from you specifically regarding the

---

[16]  *See, e.g., Dallas Ry. & Terminal Co. v. Gossett*, 156 Tex. 252, 294 S.W.2d 377, 380-81 (1956) ("the naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force and will not support a jury finding even when admitted without objection."); *Lindley v. McKnight*, 349 S.W.3d 113, 129-30 (Tex. App.–Fort Worth 2011, no pet.) (holding that the affiant's statement that she knew that Daws was relying on statements made by McKnight was conclusory and thus no evidence because it did not disclose the facts underlying that knowledge ); *Hoss v. Alardin*, 338 S.W.3d 635, 644-45 (Tex. App.–Dallas 2011, no pet.) (holding that Alardin's testimony that he and Hoss had agreed to be partners was conclusory and thus no evidence of an expression of intent to be partners); *Travelers Ins. Co. v. Wilson*, 28 S.W.3d 42, 48 (Tex. App.—Texarkana 2000, no pet.) ("A conclusory statement, whether by a lay or expert witness, is not evidence.").

disposition of the unconverted raw material." P 46(1388).

However, rather than confirm an acceptance of the entire August 13 email, Fine narrowly specified in the August 16 email precisely which aspects of the August 13 email he was agreeing to:

> I authorize you to return the chemical to your manufacturer and charge me the $12,750 for return. . . .

> Supply Pro accepts the offer of your assistance in selling the remaining 6912 bales [within] a 6 month period. Supply Pro will purchase the balance unsold at that time.

P 46(0946). Obviously, had Fine intended to agree to the entire August 13 email, there would have been no reason for him to respond in such a specific, exact, and limited manner.[17] By not agreeing or responding to any other terms in the August 13 email, Fine was clearly declining to accept them.

In this regard, Kempe's interpretations of the August 16 email is parol evidence and thus could not create an ambiguity as to its meaning. *See Kachina*, 2015 WL 5889109, at *6 ("A party's interpretation of an agreement is parol evidence and

---

[17] In his deposition that was read to the jury, Fine answered, "yes," when asked, "And so, . . . you accepted essentially the terms of the work-out deal as contained in the August 13th email; is that fair?" 4 R 77. However, in that the immediately preceding and following questions (4 R 76-77) were focused exclusively on the two provisions of the August 13 email with which Fine's August 16 email *had* agreed, his affirmative answer to the broader question, taken in context, can only be read to refer to his agreement to those two provisions of the August 13 email. *See City of Keller*, 168 S.W.3d at 812 (noting that, in reviewing legal sufficiency, evidence cannot be taken out of context in a way that makes it seem to support a verdict when it does not).

cannot be used to create ambiguity or show motive."). The same is true regarding Fine's cross-examination testimony about the content and legal effect of the take or pay term in the OAs:

> Q: Okay. Well, that's not a risk my client wanted - - assumed in the paperwork, was it? He didn't say that "You pay me as long as you get paid from BP." He said "take or pay." That was y'all's deal, and that's the deal you accepted, isn't it Mr. Fine?
> A: Yes.

4 R 70.

The August 13 and 16 emails created an unambiguous, integrated agreement that superseded any prior oral agreement; and any evidence concerning an oral agreement that was reached at the August 11 lunch is also barred by the parol evidence rule. *See Houston Exploration Co.*, 352 S.W.3d at 469 ("The parol evidence rules when parties have a valid, integrated written agreement, and precludes enforcement of prior or contemporaneous agreements.").[18]

Similarly, because the two emails can be given a definite legal meaning based on the plain meaning of the language used, they must be construed as a matter of law. *Kachina*, 2015 WL 5889109, at *2-3. Interpreting Fine's August 16 email as either

---

[18] As with the Supply Pro's contentions on the agreements created by the July POs and OAs, this challenge is based solely on contract construction, not application of the Statute of Frauds. That is, Supply Pro doesn't contend that any of the agreements are unenforceable for lack of a sufficient writing, but only that the trial court incorrectly construed the writings that formed the parties' agreements.

22

being ambiguous or as somehow impliedly accepting terms of the August 13 email to which it made no reference, not only rendered the content of the August 16 email meaningless,[19] it improperly rewrote the workout agreement to insert terms that the parties could have bargained for but did not.[20]

Because the evidence is therefore legally insufficient to show that the clawback provision was part of the workout agreement, it is also legally insufficient to support the jury's findings that the clawback provision was induced by fraud (or breached**[21]**).

**III. In the alternative, if the proposed take or pay term was part of the parties' original agreements on the July purchase orders, then the evidence raised a material fact question on whether the take or pay term was induced by fraud; and the trial court reversibly erred by refusing to submit appellants' requested charge questions on fraudulent inducement or equitable estoppel.**

**A. The take or pay term was fraudulently induced.**

---

[19]  *See Kachina,* 2015 WL 5889109, at *3 (noting that in construing a contract, courts examine the entire contract and give effect to each provision so that none is rendered meaningless); *City of Keller*, 168 S.W.3d at 811 (instructing that in construing a contract, a court does not consider only the parts favoring one party and disregard the remainder as that would render the latter meaningless).

[20]  *Ritchie*, 443 S.W.3d at 891; *Am. Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 162; *Tenneco Inc.*, 925 S.W.2d at 646.

[21]  Although the Judgment is based on the findings pertaining to Biocel's fraud claims, several of appellants' challenges to the fraud findings apply equally to the findings on Biocel's contract claims. However, because the findings on Biocel's contract claims are not part of the Judgment, any challenges directed exclusively to those findings would thus not properly be before the court. Nevertheless, appellants do not concede those findings or waive their challenges to those findings in the event of a remand.

23

A trial court is required to submit the questions, instructions, and definitions in the jury charge that are raised by the pleadings and the evidence. Tex. R. Civ. P. 278. Where a question, instruction, or definition requested by a party is supported by the pleadings and evidence, accurately states the applicable law, and would have assisted the jury, a trial court abuses its discretion by failing to submit it. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009).

A contract is subject to avoidance on the ground of fraudulent inducement. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331 (Tex. 2011). The elements of fraudulent inducement are: (1) a material representation was made; (2) the representation was false and either known to be false when made or made without knowledge of its truth; (3) the representation was intended to be and was relied upon by the injured party; and (4) the complained of injury was caused by the reliance. *See Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 423 (Tex. 2015). In this context, "material" means that a reasonable person would attach importance to, and would be induced to act upon, the information in determining his choice of action in the transaction in question. *Italian Cowboy Partners*, 341 S.W.3d at 337.

In this case, Supply Pro specifically pled fraudulent inducement of the take or pay term and equitable estoppel as affirmative defenses. 2 C 1823. The following

24

evidence supported this defense. Svoboda told Mitchell early in their discussions that "the supply chain is finite. If I wanted to get in, I better get in now." 7 R 10. Similarly, the July 11 email represented that the proposed take or pay term was necessitated by "extreme production demands" created by the spill. P 23. It further stated that the email was being sent to "all of" Biocel's Hydrphobic customers; that customers with the last minute orders were the most demanding; that many customers were booking more than their needs; and that Svoboda had customers who wanted two or three trailers of product at their location. P 23. The email then asked, "[p]lease work with us [sic] we will continue to fill all orders. It also couched the proposed take or pay term within requirements that orders required a minimum 14 day lead time, and that orders would be for full truck loads. P 23.

In July, Svoboda was continuing to tell Supply Pro that Biocel had overseas and east coast customers for the fiber, that it was "first come, first served," and that if Supply Pro wanted to get the product, it needed to put in a purchase order. 7 R 14-15. The July 13 PO repeated that the proposed take or pay term was being instituted because of "the extreme production demands" from the spill. P 30.

As late as a lunch on July 29, shortly before Supply Pro sent the July 29 PO, Svoboda told Mitchell that he was getting calls all the time for fiber to make boom, and that Supply Pro needed to get a place in line. 7 R 23-24. He similarly told Phillip

Baron, Supply Pro's operations manager (4 R 219), at that lunch that Biocel needed to get Supply Pro tied down right away because Biocel had other customers for the fiber, and Supply Pro needed to commit to giving Biocel orders so Biocel could get Supply Pro in the manufacturing loop. 6 R 76. The July 29 OA then again repeated the "extreme production demands" justification for the proposed take or pay term. P 38.

However, despite the number of people who had been *contacting* Biocel during the spill about fiber for boom (3 R 69-70, 110; 5 R 57), it turned out that Biocel's *actual* demand from customers other than Supply Pro was far from extreme. Besides Supply Pro, the biggest boom manufacturers at that time were New Pig, SPC Brady, Spill Tech, and United Absorbents. 7 R 10. Of the customers to whom Biocel had actually sold fiber for boom besides Supply Pro, Svoboda could only name New Pig, Spill Tech (which was going to make boom with it, but didn't), an unnamed company in South Carolina, and an individual named Lannie. 3 R 92-94.

Although Svoboda had represented in July of 2010 that Biocel had *supplied* hydrophobic fiber to five major boom manufacturers (P 85(1136)), Svoboda admitted at trial that he had only *talked to* five major manufacturers. 3 R 93-95. Similarly, although the July 11 email purported to be sent to all of Biocel's hydrophobic customers, Svoboda couldn't name a single other customer to whom it had been sent.

26

3 R 06-109. Nor could he name a single customer besides Supply Pro to whom the special terms had been sent on Biocel's OAs. 3 R 108.

When asked who was creating the extreme production demand referenced in the July 11 email, Svoboda could only answer, "[e]verybody," and could not name any other customers. 3 R 110. He admitted that New Pig had had a problem with the boom they made from Biocel's fiber and quit buying in June. 3 R 110-11. Svoboda then admitted that Biocel's sales for June and July were mostly to Supply Pro and that, in fact, Supply Pro was the extreme production demand referred to in the July 11 email. 3 R 110-11.

The representation in the July 11 email and July 16 and 29 OAs that Biocel's production demands would require a minimum 14 day lead time on orders also proved bogus. P 23, 30, 38. By July 27, the purported minimum 14 day lead time after the July 13 PO, Biocel had already shipped, and invoiced Supply Pro for, 16 of the truckloads ordered in the July 13 PO. P 31, 127. There is no evidence that orders from any of Biocel's other customers' had been turned away or put behind those of Supply Pro. The non-existence of the purported need for a 14 day lead time on orders thus further demonstrated the lack of any extreme production demand from other customers.

However, it hadn't been Svoboda's idea to send the July 11 email or to try to

27

impose the proposed take or pay term. In the late nineteen-seventies, Kempe had worked for an insulation company whose business went through a boom period, then crashed. 5 R 54-55. Many cellulose companies went out of business then and others were caught with warehouses full of high cost paper when the price dropped 75%. 5 R 55.

Even though there was no shortage of Biocel's raw materials (6 R 44), Kempe believed the spill was creating a similar demand bubble, and he wasn't willing to take the risk of an abrupt cancellation of purchase orders. 6 R 42-44. Although Biocel had never tried to impose a take or pay term before (6 R 44-45), Kempe viewed this as the way to shift the risk of cancellation to Supply Pro. 5 R 53; 6 R 42. However, rather than take a chance that Supply Pro would not agree to accepting this risk if it knew the truth about Biocel's actual demand from other customers, Kempe instructed Svoboda to send the July 11 email (5 R 57), creating the false impression that Biocel was experiencing more production demand than it could supply, and, thus, if Supply Pro did not go along with the proposed take or pay term, the product would all be quickly sold to Supply Pro's competitors. P 23. Biocel continued to promote this illusion with its OAs and Svoboda's remarks to Mitchell and Baron about Biocel's heavy demand until the very day Supply Pro issued its last PO. 6 R 76; 7 R 14-15, 23-24.

An analogous situation occurred in *Ford Motor Co.*, where Ford entered into a settlement agreement while the jury was deliberating in the trial of a rollover accident. *See* 444 S.W.3d at 618-20. Ford's settlement decision was strongly influenced by a note from the jury asking, "[w]hat is the maximum amount that can be awarded?" Ford later learned that the plaintiffs' attorney had conspired with the jury foreman to send that note (and against the requests of the other jurors that she not do so). *Id*. at 618-19. When Ford refused to pay the settlement amount, the plaintiff sued Ford to enforce the settlement, and Ford asserted fraudulent inducement as a defense. *Id*. at 619.

Although the jury note had merely asked a question, the Texas Supreme Court held that it nevertheless met the requirement for a false statement of fact because untrue statements of fact were clearly implied by the question:

> A jury note, asking about the maximum amount of damages, implies that the jury is deliberating damages and that it intends to award the maximum amount. It also implies that the note is from the jury collectively. The evidence indicates that neither implication was true. According to the testimony of several jurors, the jury was not actually deliberating damages at the time of Cortez's note, and several jurors specifically told Cortez not to send a note about damages. Because the note implies material statements that were false, we conclude that some evidence exists of the first element of fraudulent inducement.

*Id*. at 621.

Based on the facts showing the collusion between the plaintiffs' attorney and

29

the jury foreman, the Court found that the evidence was sufficient to establish that the note was sent at the direction of the plaintiffs with knowledge that it was false and with the intent that Ford rely upon it. *Id*. at 621-23. Likewise, because the note implied that the jury was deliberating damages and intended to award the maximum amount, and Ford had no knowledge that these implications were false, the evidence was legally sufficient to show that Ford justifiably relied on the implications in entering into the settlement. *Id*. at 623.

In this case, if the Court concludes that the proposed take or pay term was part of the original agreements on the July POs, then it can reasonably be inferred from the direct evidence outlined above that Biocel deliberately misrepresented the level of its actual demand in order to induce Supply Pro to accept the proposed take or pay term, while concealing that it was merely attempting to unilaterally shift the risk of a cancellation to Supply Pro. Because Biocel's statements, emails, and OAs created the false impression that Biocel could not keep pace with its demand and would therefore be able to sell its fiber to other customers if Supply Pro did not accept the proposed take or pay term, and Supply Pro did not know these statements were false, the evidence was sufficient to show that Supply Pro justifiably relied on these false statements and implications. Because Supply Pro would have had no reason to accept the proposed take or pay terms if it had known the truth, and would not have done

30

so,[22] the evidence was also sufficient to show actual reliance. Finally, because the proposed take or pay term was a material alteration of the terms between the parties (6 R 45), and thus subjected Supply Pro to liability for cancellation that it would not have otherwise had, the evidence was sufficient to show that Supply Pro was injured by relying on the false statements and implications. Therefore, the evidence raised a material fact question on whether the take or pay term was fraudulently induced.

## B. The fraudulent inducement was not absolved or mooted by the workout agreement.

In response to appellants' position that the fraudulent inducement of the take or pay term should have been submitted to the jury, Biocel has argued, without citation of authority, that when the parties entered into the workout agreement, any preexisting inequitable conduct became irrelevant. 4 C 2487(¶11), 2494(¶32).

There can be circumstances in which a party who was fraudulently induced to enter into a contract may ratify the contract in such a manner that his remedies for fraud are foreclosed. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 676 (Tex. 2000). Such a ratification can occur where the defrauded party, after he becomes aware of the fraud, enters into a new or amended agreement by which the

---

[22] In a February of 2011, Fine emailed Kempe, among other things, that "[i]f Larry [Svoboda] had been ethical about . . . what you were selling to others during the spill, I never would have given you a [PO]." P 62(0914).

rights of the parties are adjusted.  *See, e.g., Chambers v. Equity Bank*, SSB, 319 S.W.3d 892, 901 (Tex. App.–Texarkana 2010, no pet.).

However, one seeking to establish such a ratification has the burden to prove the defrauded party's knowledge of the fraud and their voluntary, intentional choice to ratify the agreement in light of that knowledge.  *LHC Nashua Partnership, L.L.C. v. PDNED Sagamore Nashua, L.L.C.*, 659 F3d 450, 461 (5th Cir. 2011).  The key question is whether the defrauded party had knowledge of the fraudulent acts at the time of the alleged ratification.  *Id.*  This is because it is only after the defrauded party has learned of the fraud that his performance is no longer being induced by the fraud. *See Fortune Prod. Co.,* 52 S.W.3d at 680.  Absent a ratification, there is no authority that an amendment to, or novation of, an agreement induced by fraud forecloses the defrauded party's remedies for the fraud or otherwise makes the fraud irrelevant.

In this case, there is no evidence that Fine or Supply Pro knew that Biocel's representations concerning its extreme demand had been false by the time Supply Pro entered into the workout agreement.  Because the workout agreement was therefore not a ratification of the original agreements on the July POs for this purpose, Supply Pro did not relinquish its remedies for the fraudulent inducement by entering into the workout agreement.

## C.    Error and harm.

In addition to being supported by the pleadings and evidence outlined above, charge questions on fraudulent inducement and on equitable estoppel were submitted by Supply Pro and refused by the trial court.  4 C 1958, 1961.  These questions tracked the language of Pattern Jury Charge questions 101.21-101.25 and 105.1-105.4 and were thus accurate statements of the applicable law.  Therefore, the trial court abused its discretion in refusing to submit at least one of these questions.

A trial court's error in refusing a charge question, instruction, or definition is harmful and, thus, reversible if the error probably caused rendition of an improper judgment, considering the pleadings, the nature of the case, the evidence presented, and the charge in its entirety.  *See* Tex. R. App. P. 44.1(a); *Columbia Rio Grande Healthcare*, 284 S.W.3d at 862.

In this case, Supply Pro and Fine were each held liable for fraudulently inducing a clawback provision to which they never expressly agreed and which arose from a take or pay term to which they either never expressly agreed or were fraudulently induced to accept.  They were not allowed to submit a question on, or argue, their fraudulent inducement / equitable estoppel defense. The facts giving rise to this defense preceded all facts upon which appellants' liability was based and, if found by the jury, would have eliminated roughly half of the actual damages awarded

33

as well as a significant portion of the punitive damages.

The trial court twice cautioned Biocel during the charge conference about the appellate risk of not submitting these questions, and Biocel twice refused to submit them. 8 R 6-8. These were the only questions appellants submitted on any affirmative defense, and no other question, instruction, or definition set forth any defensive theory. These questions would have not only assisted the jury, but were essential to enable the jury to make the necessary findings on a contested issue that was critical for a valid determination of appellants' liability and damages. *See Columbia Rio Grande Healthcare*, 284 S.W.3d at 851. Under these circumstances, the record clearly reflects that the refusal to submit either of these charge questions probably caused rendition of an improper judgment.

## IV. The evidence is legally insufficient to prove the damages found in charge question 7(b-d) (as well as questions 6(b-c), 10, and 11).

### A. Storage charges.

In answer to charge question 7(b) (and 6(b)), the jury found that the commercially reasonable and necessary charges for custody and care of the goods stored by Biocel was $303,815.65. 4 C 1940. Even in the incorrect form that this element was submitted,[23] there is no evidence that the K-Sorb should have been

---

[23] The trial court refused to include the word, "incurred," in this element of damage, as it is stated in the applicable TBCC provision. *See* Tex. Bus. & Com. Code Ann. § 2.710 (West

stored at all or that the rate Biocel charged for storage was commercially reasonable.

On December 1, 2010, Kempe emailed Fine to remind him that any of the 6912 bags of K-Sorb that remained unsold by February 1, 2011, would be invoiced and shipped to Supply Pro. P 58(0805). Within an hour, Fine emailed that Supply Pro had $1.7 million of feedstock that had not been converted into finished product and would probably never be used, as well as 21 truckloads of finished boom. P 58(0805). On February 1, Kempe invoiced Supply Pro $95,385.60 for the 6912 bags and stated that any of this material that was not delivered would accrue storage charges of $0.15 per bag in March, $0.20 per bag in April, and $1.00 per bag thereafter. P 60, 61. Biocel continued to store the bags until the time of trial, and its storage charges totaled the $303,815.65 awarded by the jury, and thus more than three times the total sales price of the material being stored. 5 R 150.

The evidence is legally insufficient to show that Biocel should have stored the material at all or thus that any storage charge was necessary. Before and after the spill, there was no market for boom made with hydrophobic fiber such as K-Sorb. 3

---

2009) ("Incidental damages to an aggrieved seller include any commercially reasonable charges . . . *incurred in* . . . care and custody of the goods after the buyer's breach . . . ." (emphasis added)); *Malone v. Kisabeth Co., Inc.* 726 S.W.2d 188, 191-92 (Tex. App.–Fort Worth 1987, writ ref'd n.r.e.) (reversing and rendering a take-nothing judgment on charges to store chairs on appellee's premises where there was no evidence that any loss was suffered from having to pay to have other chairs stored elsewhere; no loss from being foreclosed from storing other chairs on its premises due to these chairs occupying the space; and no evidence of any other expense being incurred from keeping the chairs on the premises).

R 112-13; P 125. After the spill, there was also no realistic prospect that demand would resume for K-Sorb because: (1) there was an excess of boom in the market (7 R 19); (2) there was a pre-existing preference for polyscrap boom (4 R 221-22); (3) boom made with fiber was more expensive than that made with polyscrap (3 R 121; 4 R 147); (4) some of the boom manufactured by New Pig with Biocel fiber had failed (3 R 56, 95-96, 99-100; 5 R 35); and, thus, (5) hydrophobic fiber fill had been identified as a product that didn't work as well as polyscrap and had a bad reputation in the marketplace. 7 R 19.

Based on Fine's December 1 email, Kempe was aware that Supply Pro was inundated with both fiber and fiber boom and, thus, had minimal chance of using any of the 6912 bags. P 58(0805). The finished K-Sorb fiber could also not be turned into any other type of product or used in any other product lines (5 R 56), but was incinerable. 5 R 40.

Kempe acknowledged that he was under no obligation to store the 6912 bags of K-Sorb (P 84(0884)), and that Fine had not asked him to do so. 6 R 46-47. Under these circumstances, because there was no reasonable expectation that the product could ever actually be sold, used, or delivered to Supply Pro, it was wholly unnecessary and unreasonable for Biocel to store it, and the K-Sorb should have instead either been discarded or incinerated. There is, thus, no evidence that the 6912

bags should have been stored at all or that any storage cost was necessary.

Even if it had been reasonable or necessary to store the material at all, the evidence is legally insufficient to support the amount awarded. Biocel stored the material on its own premises (5 R 129), but there is no evidence that Biocel incurred any out-of-pocket cost to do so.[24] Nor was there any evidence of the cost that any third-party storage facility would have charged to store the K-Sorb. In addition, no foundation was laid that Kempe had any knowledge of prevailing storage rates, and he did not testify whether he believed his rates were reasonable, let alone any basis therefor. It is likewise unfathomable how it could have been commercially reasonable for Biocel's monthly storage rate to increase five-fold (from $0.20 to $1.00) from one month to the next. P 60. Under these circumstances, the jury had no valid basis upon which to determine whether Biocel's storage rate was even remotely within the range of what was commercially reasonable.

Moreover, even if there had been evidence of commercially reasonable rates for storage, it would have been commercially unreasonable to accrue storage charges that were more than three times the purchase price of the goods being stored. After

---

[24] Although Kempe testified that the storage fee was to compensate Biocel for the burden of having to handle, store, and maintain the material (5 R 150), there is no evidence that Biocel actually did anything to handle or maintain the material, let alone of the cost of doing so. There was also no evidence that Biocel lost any sales or incurred any extra cost from storing the material in areas where other goods might have otherwise been produced or stored.

37

it became apparent that the K-Sorb could not be used or resold, and was essentially worthless, Biocel should have mitigated its damages by disposing of or destroying the material, rather than running up storage charges for over three years thereafter.[25] Therefore, the evidence was legally insufficient to support the award of storage charges.

### B. Clawback provision.

In answer to question 7c (as well as 6c and 10), the jury found that Biocel's damages pertaining to the clawback provision were $385,517.00. 4 C 1940. As discussed in section II above, the clawback provision was not expressly or impliedly part of the workout agreement. Therefore, it could not have been fraudulently induced (or breached), and the evidence is legally insufficient to support the jury's answers awarding recovery for this element of damage.

### C. Take or pay damages on the purchase orders.

In answer to question 7d (and question 11), the jury found that the unpaid amounts under the July 13 and July 29 POs was $480,902.60. 4 C 1940, 1944. This represents the amount that would have been due for all 34,848 bags that remained

---

[25] At most, Biocel's damages in this regard should not have exceeded the reasonable cost to incinerate or discard the 6912 bags of K-Sorb. However, because Biocel neither offered evidence of those costs nor submitted a damage measure that would have included them, it waived that element of damage. Tex. R. Civ. P. 279.

undelivered when Supply Pro cancelled the POs (and was the sum of the damages awarded in questions 7a and 7c).  5 R 149.

This amount was not recoverable for Biocel's fraud claim because Biocel alleged fraud only with regard to the workout agreement, not the underlying POs, and there is no evidence of any fraud by Supply Pro concerning the POs.[26]

In addition, because the 34,848 bags included the 6912 bags (P 46 (1387)) for which damages were found in question 7a (and 6a), and damages for the remaining 27,936 undelivered bags were awarded in question 7c (4 C 1940), this amount would have been a double recovery of those amounts.  There was thus no basis upon which the unpaid amounts under the POs could have properly been awarded for fraud, and question 7d (and 11) should be disregarded as immaterial.

## V.    The evidence is legally and factually insufficient to support the awards of punitive damages.

### A.    Punitive damage limits.

In any action in which there are two or more defendants, an award of exemplary damages must be specific as to each defendant.  Tex. Civ. Prac. & Rem.

---

[26]    Because the workout agreement was a novation of the agreements for the July POs (and those agreements were unambiguous): (1) the charge correctly included no questions on the terms of the POs or whether they were breached; and (2) the amounts unpaid under the POs were correctly not submitted as an element of damage in question 6, concerning damages from breach of the workout agreement.  Questions 10 and 11 were not predicated on any finding of liability.

Code Ann. § 41.006 (West 2014). As relevant to this case, exemplary damages awarded against a defendant may not exceed the greater of: (1) two times the amount of economic damages; or (2) $200,000. Tex. Civ. Prac. & Rem. Code Ann. § 41.008 (West 2014). In determining the amount of exemplary damages, the trier of fact shall consider evidence, if any, relating to: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant. Tex. Civ. Prac. & Rem. Code Ann. § 41.011 (West 2014).

In addition, the Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. *See generally Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305-08 (Tex. 2006); *Bunton v. Bentley*, 153 S.W.3d 50, 53-54 (Tex. 2004); *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 48-54 (Tex. 1998). Courts must consider multiple punitive damage awards for the same conduct to be against a party's substantive due process rights. *Owens-Corning Fiberglas Corp.*, 972 S.W.2d at 48. Under the Due Process standard, the relevant factors for determining whether punitive damages are excessive are: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the

40

punitive damages awarded; and (3) the relative size of civil penalties imposed in comparable cases. *See Tony Gullo Motors*, 212 S.W.3d at 308; *Bunton*, 153 S.W.3d at 53. Even if an assessment of punitive damages is not deemed excessive under governing state law, it may violate a party's substantive due process right to protection from grossly excessive punitive damage awards. *Owens-Corning Fiberglas Corp.*, 972 S.W.2d at 45.

## B. The evidence is legally insufficient to prove that Supply Pro committed fraud independently from Fine.

In answer to charge questions 5 and 8, the jury found that Supply Pro and Fine *each* committed fraud and that the harm to Biocel resulted from the harm of each. 4 C 1938, 1941. In this regard, Biocel's fraud claim was based on the allegations that Supply Pro had fraudulently induced the workout agreement by: (1) entering into it without intending to perform; and (2) misrepresenting that it was in a precarious financial position due to the sudden evaporation of its market for boom and that it had no expectation of receiving compensation for the cancellation of its boom sales. 2 C 1283-84. However, all of the conduct that Biocel relies upon to support these allegations was committed solely by Fine, and there was no allegation or evidence that anyone besides Fine committed or participated in any fraudulent conduct on Supply Pro's behalf. Therefore, there is no evidence to support the jury's finding that

41

Supply Pro separately committed fraud, *i.e.*, apart from that committed by Fine; or for any finding of harm resulting from such fraud by Supply Pro.

**C.     The evidence is legally insufficient to support separate awards of punitive damages against Fine and Supply Pro because there is no evidence of independent fraud by Supply Pro.**

In answer to charge questions 12 and 13, the jury found Supply Pro and Fine each separately liable for fraud and awarded punitive damages against each of them (4 C 1954-55) even though, as discussed in the preceding section, the same conduct by Fine was the alleged basis for both, and there was no allegation or evidence that anyone besides Fine committed or participated in any such conduct. In addition, Fine is the sole shareholder of Supply Pro (4 R 14; 8 R 39), and the combined $1.8 million award of punitive damages was nearly 2.3 times greater than the actual damages awarded and, thus, greater than the maximum amount that could have been awarded against a single defendant under CPRC section 41.008.

By requiring a specific award of exemplary damages against each defendant, prohibiting joint and several liability among defendants, and providing a specific list of the factors that must be considered as to each defendant, Chapter 41 of the CPRC reflects a clear policy and intent that exemplary damages be imposed against a defendant only for that defendant's own conduct and only based on application of the relevant factors to that defendant's particular conduct.

42

In this case, any wrongful conduct was committed solely by Fine. There was no one else at Supply Pro who failed to supervise him or committed any other act or omission that was fraudulent or would otherwise warrant imposition of punitive damages.

Under these circumstances, the award of punitive damages against Supply Pro as well as Fine amounts to a multiple award of punitive damages for the same conduct by a single person. *See Owens-Corning Fiberglas Corp.*, 972 S.W.2d at 48. Moreover because Fine is the sole shareholder of Supply Pro, the punitive damage award against Supply Pro results in either a multiple award of punitive damages against the same defendant or a penalty merely for Fine's business being incorporated rather than unincorporated. Rather than operating to limit liability, the corporate entity is instead serving as a mechanism for arbitrarily multiplying liability. Under such circumstances, any punitive damages should have either been awarded against Fine for his individual conduct or against Supply Pro for Fine's conduct on Supply Pro's behalf, but not both. Therefore, the trial court erred by entering judgment for punitive damages against both defendants.

**D. The combined $1.8 million punitive damage award is excessive under the Texas and Federal Standards.**

With regard to the amount of the awards, the alleged fraud in this case did not

cause physical harm, threaten health or safety, or cause or threaten financial ruin. *See*

*Tony Gullo Motors*, 212 S.W.3d at 308. Instead, nearly 90% of the fraud damages

awarded in this case was for either: (1) goods Biocel never produced and for which

it incurred no cost (and for which the underlying take or pay basis was either not

agreed to by Supply Pro or was fraudulently induced); or (2) Biocel's unnecessary

and excessive charges to store worthless goods. Under these circumstances, an award

of exemplary damages totaling $1.8 million, (as well as the imposition of punitive

damages against both Fine and Supply Pro based solely on Fine's conduct) is

excessive under both the Texas and Federal Standards.

## VI. The trial court erred by not incorporating Biocel's remittitur on prejudgment interest into the Judgment.

The period from April 27, 2012 (when the lawsuit was filed) to April 21, 2015

(the date the Judgment was signed) was six days less than three years (1089 days), or

2.984 years. Prejudgment interest, accruing on the actual damages of $783,421.05

at 5% for 2.984 years, would come to $116,886.42, rather than the $118,266.64

awarded in the Judgment. On June 29, 2015, Biocel filed a remittitur to correct this

error. 4 C 2511. The trial court erred by not incorporating this remittitur into the

Judgment. Therefore, if the amount of the Judgment is not reduced based on

appellants' other issues, appellants ask the Court to modify the Judgment to reflect

this lower amount of prejudgment interest.

## PRAYER

Based on the foregoing, appellants request the Court to: (1) reverse the judgment of the trial court except for the award of $95,385.60 (that Supply failed to pay for the 6912 manufactured bags of K-Sorb); (2) render a take-nothing judgment against Biocel's claims based on the clawback provision, the take or pay term, storage of the 6912 bags of K-Sorb, and fraud and punitive damages against Supply Pro; (3) disregard the immaterial jury findings on questions 7d and 11; and (4) remand the case for a new trial on any remaining issues.

Respectfully submitted,

 /s/ *Richard H. Edelman*
Richard H. Edelman
Texas Bar. No. 06413200
rhe@edelmanoffice.com
BARLOW JONES L.L.P.
17225 El Camino Real, Suite 400
Houston, Texas 77058
Telephone: (281) 488-8440
Facsimile:  (281) 488-6832

William F. Harmeyer
Texas Bar No. 09019000
wharmeyer@harmeyerlaw.com
WILLIAM F. HARMEYER & ASSOCIATES, P.C.
7322 Southwest Freeway, Suite 475
Houston, Texas 77074
Telephone: (713) 270-5552

Facsimile:  (713) 270-7128

**ATTORNEYS FOR APPELLANTS**

**WORD COUNT CERTIFICATION**

The number of words in this Brief, as defined in Texas Rule of Appellate Procedure 9.4(i)(1), is 11,350.

/s/ *Richard H. Edelman*
Richard H. Edelman

**CERTIFICATE OF SERVICE**

This **Brief** was eServed on **November 25, 2015** on the following counsel for appellee:

| | |
|---|---|
| T. Earnest Freeman | ernest@thefreemanlawfirm.com |
| Stephen G. Scholl | steve@thefreemanlawfirm.com |
| Jonathan S. Stoger | jstoger@stogerlaw.com |

s/ *Richard H. Edelman*
Richard H. Edelman
rhe@edelmanoffice.com

**APPENDIX**

| ITEM | Date Signed or Filed | Record Reference |
|---|---|---|
| A. Final Judgment | 04/21/15 | 4 C 2454-56 |
| B. Charge of the Court [jury verdict] | 02/12/15 | 4 C 1931-56 |
| C. The August 13 and 16 emails | | P 46 |



CAUSE NO. 2012-24524

| | | |
|---|---|---|
| ECOSORB INTERNATIONAL, INC. | § | IN THE DISTRICT COURT |
| d/b/a BIOCEL TECHNOLOGIES | § | |
| Plaintiff | § | |
| | § | |
| v. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| SUPPLY PRO, INC., and | § | |
| HARMON K. FINE, Individually | § | |
| Defendants | § | 11th JUDICIAL DISTRICT |

**FILED**
Chris Daniel
District Clerk
APR 2 1 2015
Time:____
Harris County, Texas
By____
Deputy

## FINAL JUDGMENT

On the 3rd day of February, 2015, came on to be heard the above-entitled and numbered cause and ECOSORB INTERNATIONAL, INC. d/b/a BIOCEL TECHNOLOGIES, the Plaintiff, appeared in person and by attorney of record and answered ready for trial. SUPPLY PRO, INC., and HARMON K. FINE, Individually, the Defendant, appeared in person and by their attorneys of record and announced ready for trial. A jury having been previously demanded, a jury consisting of twelve (12) qualified jurors was duly empaneled and the case proceeded to trial.

At the conclusion of the evidence, the Court submitted the questions of fact in the case to the jury. The Charge of the Court and the verdict of the jury are incorporated for all purposes by reference. Because it appears to the Court that the verdict of the jury was for the Plaintiff and against the Defendant, judgment should be rendered on the verdict in favor of the Plaintiff and against Defendant.

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that Plaintiff, ECOSORB INTERNATIONAL, INC. d/b/a BIOCEL TECHNOLOGIES has judgment against Defendants, SUPPLY PRO, INC., and HARMON K. FINE, for actual damages in the sum of $ 783,742.05, said sum representing $ 784,718.25 awarded by the jury, minus an

1

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

2454

agreed credit in the amount of $1,297.20.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that Plaintiff, ECOSORB INTERNATIONAL, INC. d/b/a BIOCEL TECHNOLOGIES has judgment against Defendant, SUPPLY PRO, INC., for exemplary damages in the sum of $800,000.00.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that Plaintiff, ECOSORB INTERNATIONAL, INC. d/b/a BIOCEL TECHNOLOGIES has judgment against Defendant, HARMON K. FINE for exemplary damages in the sum of $1,000,000.00.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that all taxable costs of Court expended or incurred in the cause by Plaintiff, ECOSORB INTERNATIONAL, INC. d/b/a BIOCEL TECHNOLOGIES are adjudged against Defendant, SUPPLY PRO, INC., and HARMON K. FINE.

IT IS FURTHER ORDERED, ADJUDGED and DECREDED that Plaintiff, ECOSORB INTERNATIONAL, INC. d/b/a BIOCEL TECHNOLOGIES has judgment against Defendant, SUPPLY PRO, INC., and HARMON K. FINE, for prejudgment interest in the amount of 118,266.64 calculated at the rate of Five Percent (5%) percent from April 27, 2012 (the date suit was filed) until the date preceding the entry of this Final Judgment.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that the total amount of the judgment here rendered shall bear interest at the rate of (5%) percent compounded annually from the date of this Final Judgment until paid.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that all writs and processes for the enforcement and collection of this judgment or the costs of court may issue as necessary.

All other relief not expressly granted in this Final Judgment is DENIED.

SIGNED this _____ day of _____APR, 2 1 2015_____, 2015.

JUDGE PRESIDING

3

2456

B

CONFIRMED FILE DATE: 2/12/2015

CAUSE NO. 2012-24524

| | | |
|---|---|---|
| ECOSORB INTERNATIONAL, INC. d/b/a BIOCEL TECHNOLOGIES | § | IN THE DISTRICT COURT OF |
| | § | |
| vs. | § | HARRIS COUNTY, TEXAS |
| | § | |
| SUPPLY PRO, INC. and HARMON K. FINE, Individually | § | 11TH JUDICIAL DISTRICT |

# CHARGE OF THE COURT

**MEMBERS OF THE JURY:**

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

## INSTRUCTIONS

1.    Do not let bias, prejudice, or sympathy play any part in your decision.

2.    Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

**FILED**
Chris Daniel
District Clerk

FEB 1 2 2015

Time: _____

By _____
Deputy

Harris County, Texas

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

1931

3.     You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4.     If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.     All the questions and answers are important. No one should say that any question or answer is not important.

6.     Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

7.     Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8.     Do not answer questions by drawing straws or by any method of chance.

9.     Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10.     Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11.     Unless otherwise instructed The answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

12.     In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

As I have said before, if you do not follow these instructions and definitions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this

2

1932

county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

\* \* \*

1933

# QUESTION 1

Did Biocel and Supply Pro agree that the following provisions would be part of the workout agreement?

"Should BP, Supply Pro's distributor(s), or other third party compensate Supply Pro for terminating boom deliveries or should BP resume such deliveries from Supply Pro or Supply Pro's distributor(s) and irrespective of the above:

1. If compensated, Biocel will be compensated by Supply Pro in the same proportion as Supply Pro is compensated, less the restocking fee of $12,750 outlined above if the raw material return option is elected by Supply Pro.

2. If deliveries are resumed, Biocel will resume deliveries in the same proportion as Supply Pro resumes deliveries.

3. Any combination of compensation or deliveries to Supply Pro will be also handled in the same proportion of compensation and deliveries to Biocel.

4. Other than the offset for the $12,750 restocking fee should Supply Pro elect that option, there will be no other offsets to compensation or quantities delivered.

5. Supply Pro will notify Biocel in a timely manner in the event compensation and, or deliveries are provided or resumed as outlined above."

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

Answer "Yes" or "No."

Answer: __Yes__

* * *

4

1934

## QUESTION 2

Did Supply Pro fail to comply with the workout agreement with Biocel?

In addition to the language of the agreement, the law imposes on a party to a contract a duty to perform the contract in good faith. In that connection, good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing.

Answer "Yes" or "No."

Answer: __YES__

\* \* \*

1935

## QUESTION 3

Did Biocel and Harmon Fine agree that Harmon Fine would personally guaranty the workout agreement?

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

Answer "Yes" or "No."

Answer: __YES__

\* \* \*

6

1936

If you answered "Yes" to Question 3 then answer the following question. Otherwise, do not answer the following question.

## QUESTION 4

Did Harmon K. Fine fail to comply with the personal guaranty with Biocel?

In addition to the language of the agreement, the law imposes on a party to a contract a duty to perform the contract in good faith. In that connection, good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing.

Answer "Yes" or "No."

Answer: __YES__

\* \* \*

1937

# QUESTION 5

Did Supply Pro or Harmon Fine commit fraud against Biocel?

Fraud occurs when—

   a.   a party makes a material misrepresentation, and
   b.   the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and
   c.   the misrepresentation is made with the intention that it should be acted on by the other party, and
   d.   the other party relies on the misrepresentation and thereby suffers injury.

   "Misrepresentation" means:

   i.   A false statement of fact, or
   ii.  A promise of future performance made with an intent, at the time the promise was made, not to perform as promised, or
   iii. A statement of opinion based on a false statement of fact, or
   iv.  A statement of opinion that the maker knows to be false, or
   v.   An expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion.

   "Special knowledge" means knowledge or information superior to that possessed by the other party and to which the other party did not have equal access.

a. Supply Pro.

Answer "Yes" or "No."

Answer: ___YES___

b. Harmon Fine.

Answer "Yes" or "No."

Answer: ___YES___

* * *

8

1938

If you answered "Yes" to Questions 2 or 4 then answer the following question. Otherwise, do not answer the following question.

## QUESTION 6

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Biocel for its damages, if any, that resulted from such failure to comply?

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

Consider the following elements of damages, if any, and none other:

a. The price of the 6912 bales on February 1, 2011, if Biocel was unable after reasonable effort to resell them at a reasonable price, or the circumstances reasonably indicated that such effort would be unavailing.

Answer: $ 95,385.60

b. Commercially reasonable and necessary charges for custody and care of the goods stored by Biocel.

Answer: $ 303,815.65

c. Biocel's proportionate share of compensation received by Supply Pro from its distributor for the termination of boom deliveries.

Answer: $ 385,517.00

* * *

9

1939

If you answered "Yes" to Questions 5a or 5b then answer the following question. Otherwise, do not answer the following question.

## QUESTION 7

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Biocel for its damages, if any, that resulted from such fraud?

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

Consider the following elements of damages, if any, and none other:

a. The price of the 6912 bales on February 1, 2011, if Biocel was unable after reasonable effort to resell them at a reasonable price, or the circumstances reasonably indicated that such effort would be unavailing.

Answer: $ 95,385.60

b. Commercially reasonable and necessary charges for custody and care of the goods stored by Biocel.

Answer: $ 303,815.65

c. Biocel's proportionate share of compensation received by Supply Pro from its distributor for the termination of boom deliveries.

Answer: $ 386,519.00

d. The unpaid amounts due under the purchase orders dated July 13, 2010 and July 29, 2010, issued by Supply Pro to Biocel.

Answer: $ 480,902.60

* * *

10

1940

Answer the following question as to Supply Pro or Harmon Fine only if you unanimously answered "Yes" to Questions 5a or 5b as to that same entity or person. Otherwise, do not answer the following question as to that same entity or person.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must not answer the following question.

## QUESTION 8

Do you find by clear and convincing evidence the harm to Biocel resulted from fraud?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

Fraud occurs when—

    a. a party makes a material misrepresentation, and

    b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, and

    c. the misrepresentation is made with the intention that it should be acted on by the other party, and

    d. the other party relies on the misrepresentation and thereby suffers injury.

        "Misrepresentation" means:

        i. A false statement of fact, or

        ii. A promise of future performance made with an intent, at the time the promise was made, not to perform as promised, or

        iii. A statement of opinion based on a false statement of fact, or

        iv. A statement of opinion that the maker knows to be false, or

        v. An expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion.

           "Special knowledge" means knowledge or information superior to that possessed by the other party and to which the other party did not have equal access.

a. Supply Pro.

Answer "Yes" or "No."

Answer: __YES__

b. Harmon Fine.

Answer "Yes" or "No."

Answer: __YES__

* * *

11

1941

If you answered "Yes" to Questions 2 or 4, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 9

What is a reasonable fee for the necessary services of Biocel's attorney, stated in dollars and cents?

Factors to consider in determining a reasonable fee include—
1. The time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly.
2. The fee customarily charged in the locality for similar legal services.
3. The amount involved and the results obtained.
4. The experience, reputation, and ability of the lawyer or lawyers performing the services.

Answer with an amount for each of the following:

a. For preparation and trial.

Answer: $ 637,455

b. For an appeal to the Court of Appeals.

Answer: $ 42,500

c. For an appeal to the Supreme Court of Texas.

Answer: $ 32,500

* * *

12

1942

## QUESTION 10

What sum of money, if any, would fairly and reasonably compensate Biocel for Biocel's proportionate share of compensation received by Supply Pro from Supply Pro's distributor for the termination of boom deliveries?

Answer: $ _385,517._

* * *

1943

## QUESTION 11

What sum of money, if any, would fairly and reasonably compensate Biocel for the unpaid amounts due under the purchase orders dated July 13 and July 29, 2010, issued by Supply Pro to Biocel?

Answer: $ 480,902.60

\* \* \*

14

# PRESIDING JUROR

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

It is the duty of the presiding juror to:

   a.   have the complete charge read aloud if it will be helpful to your deliberations;

   b.   preside during your deliberations;

   c.   see that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge;

   d.   write out and hand to the bailiff any communications concerning the case that you desire to have delivered to the judge;

   e.   vote on the questions;

   f.   write your answers to the questions in the spaces provided; and

   g.   certify to your verdict in the space provided for the presiding juror's signature or to obtain the signatures of all the jurors who agree with the verdict if your verdict is less than unanimous.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

\* \* \*

15

1945

## INSTRUCTIONS FOR SIGNING THE VERDICT CERTIFICATE

1.     Unless otherwise instructed, you may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2.     If 10 jurors agree on every answer, those 10 jurors sign the verdict. If 11 jurors agree on every answer, those 11 jurors sign the verdict. If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.     All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

4.     There are some special instructions before Questions 8 explaining how to answer that question. Please follow the instructions. If all 12 of you answer that question, you will need to complete a second verdict certificate for that question.

Do you understand these instructions? If you do not, please tell me now.

\* \* \*

_____

JUDGE PRESIDING

16

1946

# VERDICT CERTIFICATE

Check one:

_____Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

_Wanda Parish_      _Wanda Parish_

Signature of Presiding Juror      Printed Name of Presiding Juror

_____Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

| | Signature of Juror | Printed Name of Juror |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |

17

1947

If all 12 of you have answered "Yes" to Question 8, then you must sign this certificate also.

# ADDITIONAL CERTIFICATE

_____✓_____Our verdict is unanimous in answering Question 8. All 12 of us agreed to that answer. The presiding juror has signed the certificate for all 12 of us.

_____Wanda Parish_____          _____Wanda Parish_____
Signature of Presiding Juror                Printed Name of Presiding Juror

18

1948

**END OF JURY CHARGE**

1949

CONFIRMED FILE DATE: 2/12/2015

P-3

Cause No. 2012-24524

ECOSORB Int'l Inc
dba Biocell Technologies, Plaintiff

vs.

Supply Pro Inc, Defendant
and Harmon Fine,
Individually

§
§
§
§
§
§
§
§

In the District Court of

Harris County, T E X A S

11th Judicial District

### Question from the Jury During Deliberations

Question No. 1 :

Can we get a copy of Mr. Fine's deposition, please

Signed: _Wanda Bush_
Presiding Juror

Answer: See attached.

Signed this _____ day of _____, 20___.

_Mike D. Miller_
**Mike D. Miller**
**Judge Presiding**

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

**FILED**
Chris Daniel
District Clerk
FEB 1 2 2015
Time: _____
Harris County, Texas
By_____ Deputy

1950

MEMBERS OF THE JURY:

With reference to your request for certain information you are directed to the evidence, both documentary and testimonial, which was admitted in this case. However, you are instructed that if the jurors disagree as to the statement of any witness, they may, upon applying to the Court, have read to them from the court reporter's notes that part of the witness' testimony on the particular point in dispute and no other. Therefore, if you have disagreed upon any point in the testimony, and you will so state to the Court in writing, and point out in writing the point upon which you have disagreed, then the Court will have the court reporter read back to you only the testimony on the point in dispute.

The court reporter will need sufficient time to examine the notes to locate all the testimony on the point concerning your inquiry; therefore, the Court will request that you be patient and allow sufficient time for this to be done, if you so request.

_____
JUDGE MIKE MILLER

MEMBERS OF THE JURY:

In answer to your request to get a copy of Mr. Fine's deposition, you are instructed that you have received all of the evidence admitted in this trial and are guided thereby. The printed deposition transcripts themselves are not admitted in evidence.

JUDGE MIKE MILLER

1952

CONFIRMED FILE DATE: 2/12/2015

CAUSE NO. 2012-24524

| | | |
|---|---|---|
| ECOSORB INTERNATIONAL, INC. d/b/a BIOCEL TECHNOLOGIES | § § § | IN THE DISTRICT COURT OF |
| vs. | § § | HARRIS COUNTY, TEXAS |
| SUPPLY PRO, INC. and HARMON K. FINE, Individually | § § | 11TH JUDICIAL DISTRICT |

MEMBERS OF THE JURY:

In discharging your responsibility on this jury, you will observe all the instructions that have been previously given you.

* * *

_____
JUDGE PRESIDING

FILED
Chris Daniel
District Clerk
FEB 12 2015 9:19 AM
Time:_____ Harris County, Texas
By_____ Deputy

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

1953

You must unanimously agree on the amount of any award of exemplary damages.

## QUESTION 12

What sum of money, if any, if paid now in cash, should be assessed against Supply Pro and awarded to Biocel as exemplary damages, if any, for the conduct you found in answering Question 8a?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—
    a.  The nature of the wrong.
    b.  The character of the conduct involved.
    c.  The degree of culpability of Supply Pro.
    d.  The situation and sensibilities of the parties concerned.
    e.  The extent to which such conduct offends a public sense of justice and propriety.
    f.  The net worth of Supply Pro.


Answer in dollars and cents, if any.

Answer: $ __800,000__

* * *

1954

You must unanimously agree on the amount of any award of exemplary damages.

## QUESTION 13

What sum of money, if any, if paid now in cash, should be assessed against Harmon Fine and awarded to Biocel as exemplary damages, if any for the conduct you found in answering Question 8b?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—
  a. The nature of the wrong.
  b. The character of the conduct involved.
  c. The degree of culpability of Harmon Fine.
  d. The situation and sensibilities of the parties concerned.
  e. The extent to which such conduct offends a public sense of justice and propriety.
  f. The net worth of Harmon Fine.

Answer in dollars and cents, if any.

Answer: $ _1,000,000_

\* \* \*

3

1955

# ADDITIONAL CERTIFICATE

We, the jury, have answered the above and foregoing questions as herein indicated, and herewith return same into court as our verdict.

I certify that the jury was unanimous in answering the following questions:

Answer "All" or list questions: _____ALL_____

_____*Wanda Parish*_____
PRESIDING JUROR

_____WANDA PARISH_____
Printed Name of Presiding Juror

4

1956



**From:** Steve Kempe
**Sent:** Friday, August 13, 2010 3:15 PM
**To:** 'hkfine@prosorbents.com'
**Cc:** Larry Svoboda
**Subject:** BP booms

Harmon,

I enjoyed our lunch meeting Wednesday and the opportunity to discuss the situation regarding the BP booms. I am certain we can work together to craft a mutually agreeable resolution.

As you are aware, effective July 9, 2010 we instituted special terms and conditions on all K-Sorb Hydrophobic material orders. Those terms and conditions specified that orders were non cancellable once placed. Supply Pro's notice on August 4, 2010 to stop deliveries of the remaining 5 truckloads on your PO 41724 and all 28 truckloads of PO 41778 (a combined requirement of 34,848 bags) came as a complete shock to us as we were assured up until that date that the deliveries were only on hold pending revised scheduling confirmation. We currently have 6,912 bags of material and specific inventory for an additional 11,616 bags.

Based on our discussions and some subsequent thinking, we propose the following:

Should BP, Supply Pro's distributor(s), or other third party NOT compensate Supply Pro for terminating boom deliveries, or should BP not resume such deliveries from Supply Pro or Supply Pro's distributor(s):

1. Together and independently, Supply Pro and Ecosorb will continue their efforts to sell the existing Ecosorb inventory of 6,912 bags for a period of 6 months (ending February 1, 2011). Supply Pro will be invoiced for whatever of this inventory remains at the end of that period.
2. Our vendor has conditionally agreed to accept return of the unused raw material subject to their analysis, approval, and if approved, transportation, handling, and restocking fees. The total cost of processing and returning this unused material will be $12,750. If we are to return the material, we have to notify them by Wednesday, August 18, to start their evaluation and acceptance process. If we do not return the material, and it is carefully maintained, there is a shelf life of 6 months. The decision to be made is whether to return it now or to retain it in the hope of utilizing and selling the additional 11,616 bags of K-Sorb Hydrophobic to be manufactured. Please give this your immediate attention and advise what you prefer as time is of the essence in getting the return process started and completed. If you elect for us NOT to return this material, any remaining on hand on January 1, 2011 will be processed into finished K-Sorb Hydrophobic and invoiced to Supply Pro.

1


PLAINTIFF'S
EXHIBIT
4 V

**BIOCEL 001387**

3. We will waive the remaining purchase requirement of 16,320 bags (34,848 less 6,912 on hand and less 11,616 in process).

Should BP, Supply Pro's distributor(s), or other third party compensate Supply Pro for terminating boom deliveries, or should BP resume such deliveries from Supply Pro or Supply Pro's distributor(s) and irrespective of the above:

1. If compensated, Ecosorb will be compensated by Supply Pro in the same proportion as Supply Pro is compensated, less the restocking fee of $12,750 outlined above if the raw material return option is elected by Supply Pro.
2. If deliveriers are resumed, Ecosorb will resume deliveries in the same proportion as Supply Pro resumes deliveries.
3. Any combination of compensation or deliveries to Supply Pro will be also handled in the same proportion of compensation and deliveries to Ecosorb.
4. Other than the offset for the $12,750 restocking fee should Supply Pro elect that option, there will be no other offsets to compensation or quantities delivered.
5. Supply Pro will notify Ecosorb in a timely manner in the event compensation and, or deliveries are provided or resumed as outlined above.

We understand the difficulties this situation has created for both of us and believe this is a reasonable solution. As I understand it, Supply Pro relied on purchase contracts as the basis for their purchase orders to us. Accordingly, you should explore whatever recourse you may have. I believe it is highly likely that BP will make good on its boom commitments which may well resolve this matter for us both.

Kindly confirm your acceptance of the above. I also need to hear from you specifically regarding the disposition of the unconverted raw material.

Larry and I are reviewing several strategies as you and I discussed regarding ongoing natural fiber boom sales. Larry will contact you and Scott early next week to discuss our ideas.

Best Regards,
Steve


Steven A. Kempe
President
EcoSorb International
713.433.6701 Office
713.610.4706 Direct
713.433.2900 Fax
713.610.4746 Direct Fax
www.ecosorb.com

**BIOCEL 001388**

████████████████████████████████████████████████████████████

## Steve Kempe

**From:** Steve Kempe
**Sent:** Monday, August 16, 2010 4:48 PM
**To:** 'hkfine@prosorbents.com'
**Subject:** RE: BP booms

Harmon,

The return process is underway. As mentioned, they will test and approve before consenting. I don't anticipate any problem and they seem to be more than cooperative. Probably be next week before they let me know.

Steve

**From:** Harmon Fine [mailto:hkfine@prosorbents.com]
**Sent:** Monday, August 16, 2010 4:41 PM
**To:** Steve Kempe
**Subject:** RE: BP booms

I authorize you to return the chemical to your manufacturer and charge me the $12,750 for return. The goods should be returned in such condition that the manufacturer will have no cause not to accept its return.

Supply Pro accepts the offer of your assistance in selling the remaining 6912 bales withing a 6 month period. Supply Pro will purchase the balance unsold at that time. It would be very helpful for both our companies if the customer for the 50,000 pieces of boom would place an order with Supply Pro.

Best Regards,
Harmon K. Fine
Supply Pro, Inc.
1231 Hahlo St.
Houston, Texas 77020

phone: 713-672-9080
fax:   713-674-7659
email: hkfine@prosorbents.com
Visit our website at www.prosorbents.com.

BIOCEL 000946